AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

black Huawei, Model BND-L34, serial number 4AV7N18403003406 in the custody of US Fish & Wildlife, 610 Ash St, Ste 1103, SD, CA

Case No. **19MJ5066**

FILED
NOV 1 3 2019
CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 545 | Smuggling/Importation Contrary to Law |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Glenn Yeck, Special Agent, US Fish & Wildlife
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/13/2019

*Judge's signature*

City and state: San Diego, California

Hon. Andrew G. Schopler US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is a black Huawei cellular telephone, Model BND-L34, serial number 4AV7N18403003406. The phone is currently in the possession of the US Fish and Wildlife Service, Office of Law Enforcement, 610 West Ash Street, Suite 1103, San Diego, California.

## ATTACHMENT B

The following evidence to be searched for and seized is limited to evidence of violations of Title 18 USC § 545 (Smuggling/Importation Contrary to Law), 16 USC § 1538(c)(1) and 1540(b)(1) (Wildlife Trade in Violation of the Convention on Trade in Endangered Species), and 16 USC § 1538(d)(1) and 1540(b)(1) (Commercial Trade in Fish and Wildlife with a Permit), for the period from July 10, 2019, to present:

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate efforts to illegally import, purchase, sell, transport and/or ship sea cucumber, fish maw, and other federally-protected species of wildlife, including related financial information;

    b. images of sea cucumber, fish maw, and other protected species of wildlife;

    c. tending to indicate knowledge of the legal requirements for the purchase, sale, transport, shipment, import and export of sea cucumber, fish maw and protected species of wildlife, and knowledge of the requirements of and status of wildlife protected by the Convention on International Trade in Endangered Species;

    d. tending to identify other facilities, storage areas, storage devices, or services such as email addresses, IP addresses, phone numbers, that may contain

electronic evidence tending to indicate efforts to illegally traffic in fish or wildlife;

e. tending to identify co-conspirators, criminal associates, or others involved in the illegal harvest, sale, or trafficking of fish and wildlife;

f. tending to identify travel to or presence at locations where species of fish and wildlife were illegally harvested, sold, purchased, transported, exported and/or delivered;

g. tending to identify the user of, or persons with control over or access to, the subject phone; or

h. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Glenn Yeck, being duly sworn, declare and state as follows:

1. I am a Special Agent ("SA") of the United States Fish and Wildlife Service ("FWS") within the Department of the Interior, and have been so employed for eight years. I am currently assigned to the FWS Office of Law Enforcement in San Diego, California, which investigates wildlife trafficking crimes, including the unlawful importation and exportation of wildlife. I attended the Federal Law Enforcement Training Center's Criminal Investigator Training Program academy and FWS Special Agent Basic School in 2011. My training included classes on the smuggling of fish and wildlife products.

2. Prior to my employment as a special agent, I was employed as a law enforcement officer with the Florida Fish and Wildlife Conservation Commission and as a Naval Intelligence Officer. I have a Political Science degree from the University of Pennsylvania and a juris doctor degree from the University of California at Los Angeles School of Law. I have participated in investigations related to wildlife trafficking crimes, including smuggling. I have investigated individuals and networks that participate in the commercial import and export of federally-protected wildlife.

3. I make this affidavit in support of an application by the United States of America for a warrant to search the cellular phone found in the possession of Mr. Wei LI of Staten Island, New York (hereinafter "the subject phone"). I seek authority to search the subject phone, made by Huawei, Model BND-L34, serial number 4AV7N18403003406, for the period of July 10, 2019 to the present, for

1

information more fully described in Attachment B, for evidence, fruits, and instrumentalities of violations of federal criminal law.

4. The facts set forth in this affidavit are based on my own personal knowledge, information gained through my training and experience, and knowledge obtained from other individuals during this investigation, including other law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each fact that I have learned during this investigation.

5. Based on my experience and training and the information set forth herein, probable cause exists to believe that the subject phone contains evidence related to violations of federal wildlife conservation and protection laws, including 18 USC § 545 [Importation of Merchandise Contrary to Law]; 16 USC § 1538(c)(1) [Trafficking in Wildlife in violation of the Convention on the International Trade of Endangered Species (CITES)]; and 16 USC § 1538(d)(1) [Unlawful Trade in Wildlife]. I believe that telephone numbers, identities, addresses, emails, texts, calls, videos, documents, geolocation data, and other information exist on the subject phone which pertains to the illicit trafficking of protected species of fish and wildlife. It is a common practice for wildlife traffickers to work in conjunction with other individuals by utilizing cell phones to maintain communications with co-conspirators to further their criminal activities. This is often true in cases involving commercial quantities of protected species. Frequently, drivers, pedestrians, and other smugglers crossing the international border are known to be in telephonic contact with co-conspirators prior and subsequent to the crossing of the load vehicle. Wildlife smugglers use cellular telephones because they are mobile and provide instant access to calls and texts, with which they are able to monitor the progress of

their illegal cargo while in transit, and direct drivers to coordinate drop-offs and pick-ups of said cargo, and arrange its further transshipment.

## APPLICABLE U.S. LAWS

6. Section 545 of Title 18 of the United States Code prohibits the fraudulent or knowing importation of merchandise from the United States contrary to any U.S. law or regulation (provided that there is a statute specifying that a violation of the regulation is a crime), or in any manner facilitating the transportation, or sale of such merchandise, knowing it was imported contrary to law.

7. The Endangered Species Act, Sections 1538(c)(1) and 1540(b)(1) of Title 16 of the United States Code, prohibits engaging in trade in a species covered by the Convention on International Trade in Endangered Species (CITES) contrary to the provisions of the agreement. The regulations prohibit the import, export, re-export and any international trade in a species covered by CITES unless in compliance with the regulations. 50 C.F.R. § 23.13(a). In order to lawfully export a species covered by CITES, the exporter must obtain, at a minimum, a CITES Export Permit from the U.S. Fish and Wildlife Service ("FWS"). 50 C.F.R. §§ 23.20(e) and 23.36. The United States and Mexico are all signatories to CITES. Only one sea cucumber species found in Mexico, *Isostichopus fuscus*, is listed in CITES, on Appendix III.

8. Import/export licenses from the FWS are required for the commercial importation and exportation of fish and wildlife, pursuant to 16 U.S.C. § 1538(d)(1), and 50 C.F.R. § 14.91. Fish and Wildlife regulations create a rebuttable presumption that more than eight specimens of any single species constitutes a commercial quantity. 50 CFR § 14.4. Federal regulations further require that a declaration form

(Form 3-177) be presented to FWS with each import and export, pursuant to 50 C.F.R. § 14.61 and 50 C.F.R. § 14.63, respectively. The Form 3-177 requires information to be provided, under penalty of perjury, regarding the name and address of the importer and exporter, the FWS import/export permit number, the name of the transporter and the Customs broker, and the scientific and common name of the species involved, as well as the quantity, value, and country of origin. In addition, to obtain Customs clearance of wildlife exported from the United States (required for a lawful export), an exporter must provide to FWS all permits or other documents required by the laws or regulations of any foreign country. 50 C.F.R. § 14.52(c)(3).

## INFORMATION FROM US CUSTOMS OFFICERS

9. According to reports of U.S. Customs and Border Protection, on September 19, 2019, Mr. Wei LI entered the United States from Mexico at the San Ysidro West Pedestrian Port of Entry in San Ysidro, California. At primary inspection, LI provided two negative declarations, whereupon he was sent to the x-ray machine for further inspection. At the x-ray machine, CBP Agricultural Specialist Lizboa-Morales detected an anomaly in LI's bag and referred it to CBP Technician Davis, who identified the product as sea cucumbers. When Davis asked LI what he had in his bag, LI declared only cigarettes, stating that he was going to New York. LI was determined to have 1.2 kg of undeclared sea cucumber in his bag, consisting of approximately 46 pieces of what appear to be the same species. LI was also in possession of the subject phone, a Huawei, Model BND-L34, serial number 4AV7N18403003406. The sea cucumbers were later provisionally identified by FWS Wildlife Inspector Benjamin Oh to be of the genus *Holothuria*. They will be sent to the US Fish and Wildlife Service Forensic Lab for species identification.

## INFORMATION FROM INTERVIEW OF MR LI

10. After advisement of his Constitutional rights, LI waived his rights in writing and agreed to speak to agents. Special Agent Ryan Hill of Homeland Security and I interviewed Wei LI in the English language on September 19, 2019. LI was born in China, and is a US citizen who goes by the name of "Johnny." He lives and works out of his home in Staten Island, New York, as a seafood importer-exporter with his wife, Caiping Li. Li stated that the products they import included dried fish maw, sea cucumber, and coconut.

11. "Fish maw" is the common name for the swim bladder of a fish. Based on my training and experience, I know that there is a significant trade in the swim bladders of the endangered *Totoaba macdonaldi* fish, found only in the Gulf of California in Mexico. *Totoaba* have been listed as endangered in Mexico since 1975 and are listed on Appendix I of CITES. *Totoaba* swim bladders are highly prized in Asia, where a single swim bladder can sell for over $35,000.

12. LI said he had been in Mexico for 17 days meeting with colleagues and potential business partners in the seafood import-export business. A friend had given him the sea cucumber, telling him it was "fine to cross with." "It's not a crime, like the other crimes of sea cucumber," said LI. I asked if it was a protected species, to which LI replied: "This one is in the season. People can catch right now. No problem. You can take some to eat." I reminded LI that he had no paperwork for the sea cucumber imported that night. "This one, ah, crazy," he replied. "They say, you know, 'Take one kilo. No problem. Just for yourself, to eat.' I say 'Ok'," he replied. After the agents noted the requirement to declare all merchandise, including sea cucumber, to US Customs officials at the border, LI asked, "You mean, a little bit, it's not ok?" LI acknowledged the requirement to declare all merchandise but

then said, "but I don't wanna, sometimes. I don't want the trouble, you know?" I asked him to clarify what he had said, and LI confirmed that he did not want to go through the trouble of having to declare the sea cucumber.

13. LI said he met with his friend "Kevin Li" in Mexico, stating they were not related and that there are lots of Li's. The agents were aware that an Asian male named Kevin Li had been stopped at the US-Mexico border in Calexico, CA in June 2019 for having attempted to smuggle sea cucumber (which appeared to Wildlife Inspector Oh to be of the species *Isostichopus fuscus*) into the US from Mexico. LI later claimed that Kevin's last name was actually "Yang," and that Kevin was not the source of the sea cucumber in LI's bag.

14. LI said he met Kevin through his friend Alan Ren, who is in the Chinese restaurant business in Long Island, New York. Ren is "the boss" and had directed LI to go to Mexico to assess the quality of sea cucumber for potential purchase and export. Ren used to live and work in Mexico. They have known each other for four or five years.

15. On February 2, 2018, Ren was sentenced to ten months in custody, followed by three years of supervised release, for his conviction for conspiracy to smuggle commercial quantities of sea cucumber (including Isostichopus fuscus) into the US from Mexico, in Criminal Case No. 17cr1065-JLS.

16. LI showed me his cell phone call history from the 17-day trip to Mexico. There were numerous calls between LI and REN during said timeframe. I asked if REN had LI meet REN's friends on the recent trip. LI responded with "This time?" I asked if there was another time LI had gone to Mexico. LI said no. A subsequent crossing history review indicated that LI had been in Mexico three other times.

17. LI showed me some photos on his phone. There were pictures of several different species of sea cucumber. I observed a receipt for a charge of "788.00"

6

dated September 1, 2019, on LI's phone. LI said it was a UPS receipt for shipping sea cucumber, and affirmed that he and Kevin had shipped sea cucumber via UPS. I asked whether LI had declared the sea cucumber shipment, as per federal wildlife import-export regulations. LI said he did not know. He claimed that the shipment consisted of a sample of four sea cucumbers, of the same species that he had in his bag that night, and that the charge of 788 was in Mexican pesos. A review of the Fish and Wildlife database containing records of the import/export declarations revealed no declaration by anyone for sea cucumbers being imported from Mexico on September 1, 2019.

17. I also observed a photo of a building LI called "a warehouse" near Tijuana, Mexico, which LI had visited to assess the viability of storing product there. The building appeared to be about the size of an aircraft hangar. LI advised that he used WeChat to communicate, in addition to standard cell phone text messaging.

18. Subsequent examination of LI's travel history indicates that he frequently travels internationally. LI made approximately 32 trips outside the U.S. in a 43-month period. Given that some trips overlapped months, LI was abroad in 36 of said 43 months. Based on my experience and training in working international wildlife trafficking investigations, I know that individuals must communicate well in advance with vendors, brokers, freight forwarders, travel agents, and trans-shippers to coordinate the logistics, invoices, bills of lading, flights, and payments of international shipments, and for purchasers to make arrangements to meet with suppliers and determine what merchandise is available. For this reason, I believe there is probable cause to believe that there is relevant data on the subject phone beginning on or about July 10, 2019, the day after LI returned to New York's JFK Airport from El Dorado International Airport in Colombia before he travelled to Mexico, on September 2, 2019.

**USE OF CELL PHONES**

19. Based on my training and experience, and conversations with other law enforcement agents, I know that commercial dealers in marine species post images of their products on the internet and send images and messages via email, Facebook Messenger, WhatsApp, and other social media platforms to potential customers to facilitate sales, which are found on cell phones. In particular, with respect to international sales, I know that business is conducted via electronic mail and cell phones, including transmission of invoices and records of payment and shipping records, in order to facilitate the international transactions. I know that in other investigations I have seen shipping records, receipts, financial records, and documents sent via email, text messages and apps found on cell phones. I also know that such businesses contact regulatory agencies (federal, state, local and foreign) via email and cell phone, seeking and providing information and documentation. Such businesses are also known to send and receive via email on links accessed via cell phones to informational sites on the internet relevant to their business.

## Cellular Telephone

20. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device

may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time, labor intensive, and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data for a cellular telephone subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court, and the cellular phone will be returned to its owner.

//
//
//

**CONCLUSION**

23. Based on the foregoing, there is probable cause to believe the items identified in Attachment B constitute evidence of violations of 18 USC § 545 [Importation Contrary to Law]; 16 USC § 1538(d)(1) and 1540(d)(1) [commercial import/export of fish and wildlife without possessing required export permit]; 16 USC § 1538(c)(l) and 1540(b)(l) [violation of regulations implementing the Convention on International Trade in Endangered Species], related to illegal export of fish and wildlife, and will be found on the subject phone, as described in Attachment A, during the time period described in Attachment B.

Glenn Yeck, Special Agent,
U.S. Fish & Wildlife

Sworn to and subscribed in my presence this 13th day of November, 2019.

HONORABLE ANDREW SCHOPLER
United States Magistrate Judge